**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                  )
**JERRY HEROTH, SR.**, **et al.**,     )
                                  )
        **Plaintiffs**,               )
                                  )
        v.                        )    **Civil Action No. 05-944 (GK)**
                                  )
**KINGDOM OF SAUDI ARABIA**,          )
**et al.**,                           )
                                  )
        **Defendants**.               )
_____)

## MEMORANDUM OPINION

On May 12, 2003, terrorists associated with the Al-Qaeda network perpetrated a suicide truck bombing at a residential compound in Riyadh, Saudi Arabia. The compound housed civilian employees of Vinnell Corporation, a defense contractor and Northrop Grumman subsidiary, which was working to train and modernize the Saudi Arabian National Guard ("SANG"), a branch of the Saudi Armed Forces. The bombing tragically resulted in death or serious injury for a number of Vinnell employees.

Plaintiffs, Vinnell employees injured or killed in the attack and their family members, bring this wrongful death and personal injury action against the Kingdom of Saudi Arabia and SANG. They allege that Defendants failed to warn them of the inadequate security at the Riyadh compound and otherwise failed to provide adequate security. Plaintiffs also bring a breach of contract claim, as third party beneficiaries, for the breach of any express

or implied duties to secure the compound expressed in any contracts existing between Vinnell and Saudi Arabia[1] or the United States and Saudi Arabia.

This matter is before the Court on Defendants' Motion to Dismiss [**Dkt. No. 9**] pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons set forth below, Defendants' Motion is **granted** and this case is dismissed for lack of subject matter jurisdiction.

# I.  BACKGROUND[2]

## A.  The Foreign Military Sales Program

Pursuant to the Arms Export Control Act, 22 U.S.C. §§ 2751 et seq., Congress has created the Foreign Military Sales ("FMS") Program, which provides a mechanism for the United States Government to sell defense articles and services to foreign governments. The United States Government may do so upon a finding by the President that the sale "will strengthen the security of the United States and promote world peace." 22 U.S.C. § 2753(a)(1). Participation in the FMS Program is limited to foreign governments

---

[1] As further described below, there is no contractual relationship between the government of Saudi Arabia and Vinnell.

[2] For purposes of ruling on a motion to dismiss for lack of subject matter jurisdiction, the factual allegations of the complaint are generally presumed to be true. See Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000). Therefore, the facts set forth herein are taken from the Complaint, unless otherwise noted.

and international organizations.  See 22 U.S.C. § 2753(a); Security Assistance Management Manual, DoD 5105.38-M § C4.T2 (available at http://www.dsca.mil/samm/).

Procurement under the FMS Program is governed by terms and conditions set out in a Letter of Offer and Acceptance ("LOA") between the United States Government and the foreign government. Id. § C5.4.[3]  Following the execution of the LOA, the United States procures defense articles and services directly from a defense contractor.  The U.S. Government then sells these articles and services to the foreign government.  Thus, for defense articles procured under the FMS Program, there are contractual relationships between the United States and the foreign government and between the United States and the defense contractor.  Notably, there is no contract between the foreign government and the defense contractor.

As described in The Management of Security Assistance, published by the Defense Institute of Security Assistance Management:[4]

[The LOA] states that the foreign purchaser has

---

[3] On occasion, usually in the more complex transactions, the parties also sign a Memorandum of Understanding ("MOU"), as was done in this case.

[4] The Defense Institute of Security Assistance Management ("DISAM") is a branch of the Defense Security Cooperation Agency, an agency within the Department of Defense.  According to its website, DISAM "provides professional education, research, and support to advance U.S. foreign policy through Security Assistance and Cooperation."  http://www.disam.dsca.mil (last visited July 9, 2008).

3

> essentially delegated the entire procurement process to the [Department of Defense ("DoD")].  In this relationship the DoD[] will conduct the procurement on behalf of the customer using the same regulations and procedures that DoD uses to procure for itself.  Under traditional FMS, the foreign purchaser is not responsible for any procurement actions following the acceptance of the LOA....[T]he DoD takes responsibility for conducting the entire procurement process to include contractor source selection, negotiating the contract terms and conditions, contract administration, quality control, inspection, acceptance and audit functions.
>
> As a very broad generalization, the traditional FMS process can be characterized as a foreign purchaser, by means of the LOA, employing the DoD to conduct a defense procurement on its behalf.

Chap. 15 at 9 (available at http://www.disam.dsca.mil/pubs/DR/15%20Chapter.pdf).

The FMS Program has certain distinct advantages over direct commercial sales between the foreign government and the defense contractor.  Some defense articles may only be purchased through the FMS Program.  Id. at 1-2.  Participation in the FMS Program may also present political advantages to the foreign government and helps to build strong relationships between the United States military and its foreign counterpart.  Id. at 2-3.  Additional benefits to foreign governments include shorter procurement delays, lower prices through economies of scale achieved by the Department of Defense, and the opportunity to benefit from the DoD's familiarity with the U.S. defense procurement system.  Id. at 3-4.

  **B. Saudi Arabian National Guard Modernization Program**

The Saudi Arabian National Guard ("SANG") is a branch of the

4

Saudi Arabian Armed Forces. "Historically, SANG has had the dual mission of maintaining internal stability and defending against external threats." The OPM-SANG Mission, https://www.opmsang.sppn.af.mil/Mission/Mission.htm. Following the September 11, 2001 terrorist attacks, SANG has increasingly focused on providing internal security within Saudi Arabia. Id.

In 1973, the Saudi and United States Governments signed both an LOA and an MOU to establish a program to assist with the modernization of the SANG. "The modernization program is open ended and includes training, supply, maintenance, operations, medical, construction, equipment fielding, equipment post fielding support, and a host of other related commercial acquisition activities." Compl. ¶ 25. The LOA contained an indemnification provision under which Saudi Arabia would indemnify and hold harmless the United States Government for any loss or liability which might arise in connection with the agreement. The LOA also provided that any disputes that arose under the agreement would be resolved under United States procurement law.

In 1975, Vinnell Corporation was awarded the SANG Modernization Program contract. Vinnell has managed the program for the past three decades under a series of subsequent contracts. The five-year contract awarded in 1998 had an estimated value of $831 million.

**C.   The May 12, 2003 Bombing**

In 2003, a number of Vinnell employees were housed at a SANG residential compound located in Riyadh, Saudi Arabia (the "Vinnell Compound").  The Vinnell Compound was owned and controlled by the Defendants, who were responsible for its security.  The Vinnell employees, including the Plaintiffs, were required to live in the Vinnell Compound.[5]

On May 1, 2003, the State Department warned of the possibility of imminent terrorist attacks against American interests in Saudi Arabia.  The U.S. Government requested that the Saudi authorities bolster security at residential compounds housing foreign workers, but according to the Complaint, the Saudis failed to act.

At 11:15 p.m. on May 12, 2003, terrorists associated with Al-Qaeda fatally shot two SANG guards at the entrance to the Vinnell Compound in Riyadh.  They opened the Compound's sliding metal gate from the then-unoccupied guard booth and drove a truck packed with explosives towards an apartment block located inside the complex.  The truck-bomb was detonated next to the apartment block, leading to its destruction and that of several other buildings.  The blast from the explosion could be felt several kilometers away.  The Saudi Government later acknowledged that security lapses contributed to the success of the attack.

---

[5] The Plaintiffs "are predominately former U.S. military servicemen who were recruited in the United States" by Vinnell. Compl. ¶ 3.

Two of the Plaintiffs, James Carpenter II and Quincy Knox, were killed by the explosion. Plaintiffs Felix Acevedo, James Alford, Eric Garza, Michael W. Luttrell, Nelson Lopez, Raphael A. Maldonado, Stanley C. Shider, Allen Ceruti, Kenneth Hunley, Donald Lam, Erick Nelson, Donald Viner, Terry Young, and Gary Coon all suffered serious physical and psychological injury in the attack. Plaintiff Jerry Heroth, Jr. was physically injured and suffered severe Post Traumatic Stress Disorder from the bombing. As a result, according to the Complaint, he later took his own life.

## II.  STANDARD OF REVIEW

In challenging a court's subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. §§ 1602 et seq., the defendant bears the burden of establishing that none of the exceptions to sovereign immunity under the FSIA apply. Princz v. Fed. Republic of Germany, 26 F.3d 1166, 1171 (D.C. Cir. 1994). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000). When the defendant contests jurisdictional facts alleged in the complaint, however, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a

ruling upon a motion to dismiss." Id.  A district court retains considerable discretion in "devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." Id.

**III. ANALYSIS**

   **A.   The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq.**

Foreign states are generally immune from suit in American courts, unless one of the exceptions enumerated in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq., applies. Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).  The FSIA therefore provides the only basis for asserting subject matter jurisdiction over a foreign state in American courts.  28 U.S.C. § 1330(a); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).

Under the FSIA, immunity extends beyond foreign states to cover their "political subdivisions" and "agencies or instrumentalities." 28 U.S.C. § 1603(a).  A branch of a foreign nation's armed services, like SANG, is considered a political subdivision of the foreign state under the Act. Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 150 (D.C. Cir. 1994).

At issue in this case are two of the FSIA's listed exceptions to the general presumption of foreign sovereign immunity. See 28 U.S.C. § 1605(a). First, Plaintiffs invoke the implied waiver exception of 28 U.S.C. § 1605(a)(1) (applying where "the foreign state has waived its immunity either explicitly or by

8

implication"). Second, Plaintiffs argue that this case falls within the commercial activity exception. 28 U.S.C. § 1605(a)(2). More specifically, they contend that this is a case "in which [1] the action is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." Id. As discussed more fully below, neither exception applies.

### B. The FSIA's Implicit Waiver Exception Does Not Apply

The FSIA's implicit waiver exception, 28 U.S.C. § 1605(a)(1), is to be construed narrowly and in light of the requirement that the foreign state must have intended to waive its sovereign immunity. Creighton Ltd. v. Gov't of the State of Qatar, 181 F.3d 118, 122 (D.C. Cir. 1999). This intentionality requirement is "reflected in the examples...set forth in the legislative history of § 1605(a)(1), all of which arise either from the foreign state's agreement (to arbitration or to a particular choice of law) or from its filing a responsive pleading without raising the defense of sovereign immunity." Princz, 26 F.3d at 1174.

The LOA between the United States and Saudi Arabia provides that disputes under the agreement will be resolved under United States procurement law. The Court, however, need not determine if, as Plaintiffs argue, this choice of law provision constitutes an implied waiver of Saudi Arabia's sovereign immunity. See Marlowe

9

v. Argentine Naval Comm'n, 604 F. Supp. 703, 709 (D.D.C. 1985) ("if the parties to a contract agree that the laws of one country will govern contractual interpretations, they have implicitly waived the defense of sovereign immunity").

Even if Saudi Arabia waived its sovereign immunity with regard to the parties to the LOA, a contractual waiver of immunity does not apply to third parties who are not privy to the contract. Keller v. Transportes Aereos Militares Ecuadorianos, 601 F. Supp. 787, 789 (D.D.C. 1985); Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1017 (2d Cir. 1993); Pere v. Nuovo Pignone, Inc., 150 F.3d 477, 482 (5th Cir. 1998). Plaintiffs, of course, were not parties to the LOA. For that reason, the parties agree that the implied waiver exception would only apply if the Plaintiffs were third party beneficiaries of the agreement. And as third party beneficiaries, the scope of remedies available to Plaintiffs would be limited. They would only be entitled to enforce the provisions of the LOA, but not to bring independent tort claims. Cambridge Holdings Group, Inc. v. Fed. Ins. Co., 357 F. Supp. 2d 89, 95 (D.D.C. 2004) ("Even if the plaintiff had plead the necessary elements to be considered a proper third-party beneficiary, it could only sue to enforce the provisions of the agreement.") (emphasis in original).

Plaintiffs, however, cannot even meet the threshold requirement that they are third-party beneficiaries of the LOA. To

establish third party beneficiary status under a government contract, a "party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001). Thus, only plaintiffs who were intended to be the direct beneficiaries of the contract qualify as third party beneficiaries. Id. Indirect beneficiaries who benefit on a merely incidental basis have no right to enforce the agreement. Id. (citing RESTATEMENT (SECOND) OF CONTRACTS § 302). The direct beneficiaries need not be named in the contract, but it is essential that "the parties to a contract must directly and unequivocally intend to benefit a third-party." Bowhead Info. Tech. Servs., LLC v. Catapult Tech., Ltd., 377 F. Supp. 2d 166, 171 (D.D.C. 2005) (internal quotation marks omitted). "The parties' mere knowledge or awareness that a contract may benefit a third-party is insufficient, without more, to demonstrate an intent to confer a benefit on the third-party." Id.

Plaintiffs argue that the LOA "implicitly created employment for the Plaintiffs." Opp'n at 31. Thus, their argument is that the contract between the United States Government and Saudi Arabia created a benefit (i.e. employment) not for Vinnell, but even more tangentially, for Vinnell's employees. This is, at most, the type of incidental benefit that does not qualify for third party

11

beneficiary status.  Plaintiffs point to no language in the LOA--or any other evidence for that matter--that shows that the governments of Saudi Arabia and the United States intended to directly benefit the Plaintiffs as individuals.  Accordingly, Plaintiffs' third party beneficiary argument is unavailing and the implied waiver exception to the FSIA, 28 U.S.C. § 1605(a)(1), does not apply.

**C.   The FSIA's Commercial Activity Exception Does Not Apply**

Two clauses of the FSIA's commercial activity exception are also at issue in this case.  The first provides that a foreign state does not possess sovereign immunity for an action "based upon a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  In the second, sovereign immunity does not apply when a case is based "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."[6]  Id.  Each clause will be addressed in turn.

   **1.   Plaintiffs' Claims Are Not Based upon Commercial Acts Carried on by the Defendants in the United States**

Plaintiffs argue that Defendants engaged in commercial activity in the United States when their "agent," Vinnell, recruited its employees in the United States.  To succeed on this

---

[6] The commercial activity exception's third clause, which is not at issue here, applies to cases based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  Id.

12

theory, Plaintiffs must prove an agency relationship existed between Vinnell and the Defendants.

Under the first clause of the FSIA's commercial activity exception, a foreign state may surrender its sovereign immunity based upon the commercial acts of its agents within the United States. <u>Mar. Int'l Nominees Establishment v. Republic of Guinea</u>, 693 F.2d 1094, 1105 (D.C. Cir. 1982). The analysis should be guided "in light of broad agency principles." <u>Id.</u> An agent's acts in the United States will constitute commercial acts "carried on" by the foreign state only if the foreign government explicitly or implicitly authorized the acts of its agent. <u>Id.</u> at 1107. Moreover, borrowing principles used in determining the existence of personal jurisdiction, the Court of Appeals held that the foreign government must purposely avail itself of the benefits of doing business in the United States through the authorized acts of its agent. <u>Id.</u> at 1108.

More generally, the Court of Appeals has held that the "relationship of principal and agent depends...upon the principal having 'the right to control the conduct of the agent with respect to matters entrusted to [the agent].'" <u>Transamerica Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d 843, 849 (D.C. Cir. 2000) (quoting RESTATEMENT (SECOND) OF AGENCY § 14). At a minimum, a principal-agent relationship "'results from the manifestation of consent by one person to another that the other shall act on his

behalf and subject to his control, and consent by the other so to act.'" Id. at 849-50 (quoting RESTATEMENT (SECOND) OF AGENCY § 1).

In this case, there is no conceivable agency relationship between Vinnell and Defendants. Vinnell does not even have a contractual relationship with Defendants.[7] Instead, it is an independent contractor of the United States Government; the United States Government, in turn, has a relationship with the Saudi Government as set forth in the LOA.

Furthermore, there is no indication that Defendants authorized Vinnell to recruit employees in the United States or that Defendants had the right to control the conduct of Vinnell with respect to its recruitment of employees, in the United States or anywhere else, for that matter. At most, Plaintiffs allege in the Complaint that "upon information and belief...the Defendants directly and affirmatively chose Vinnell to be the contractor for the SANG modernization program." Compl. ¶ 24. The Complaint also alleges that the resulting negotiations between Vinnell and the United States Government "were conducted at the behest of Saudi Arabia." Id. Neither of these facts establish that the Defendants had a right to control Vinnell's conduct.

---

[7] This is not to say that a contractual relationship is either a prerequisite to an agency relationship or sufficient to establish such a relationship. Rather, its absence in this case illustrates the lack of any relevant legal relationship between Vinnell and Defendants.

Plaintiffs also point to a provision in the MOU that provides that "Saudi Arabia will be responsible for the necessary planning, programming, priority establishment, <u>recruitment and selection processes</u> which are required to provide qualified manpower to meet the expanding requirements of the overall National Guard Modernization Program." Memorandum of Understanding Concerning the Saudi Arabian National Guard Modernization Program, U.S.-Saudi Arabia, Mar. 19, 1973, 24 U.S.T. 1106, § IV.B (emphasis added). But as Defendants correctly explain in their Reply, the MOU "does not mention Vinnell or any third party" and "does not indicate that Saudi Arabia participated in any way in Vinnell's pre-employment recruiting activities in the United States." Reply at 12. Nor is there any indication in the record that Defendants had the right to control Vinnell's activities in Saudi Arabia. In sum, the record provides no support for the existence of an agency relationship between Vinnell and Defendants.

Because Plaintiffs cannot establish such a relationship, their claims are not based on commercial acts conducted by Defendants in the United States under the first clause of the commercial activities exception, 28 U.S.C. § 1605(a)(2).

### 2. **Plaintiffs' Claims Are Not Based upon Acts Performed in the United States in Connection with a Commercial Activity of a Foreign State Elsewhere**

Plaintiffs also argue that the second clause of the commercial activity exception, namely for acts "performed in the United States

in connection with a commercial activity of the foreign state elsewhere," applies. 28 U.S.C. § 1605(a)(2). They contend that the Defendants were engaged in commercial conduct in Saudi Arabia and that Defendants' failure to warn of inadequate security precautions at the Vinnell Compound was an act "performed in the United States."

To qualify as an act performed in the United States in connection with a commercial activity elsewhere, "'the acts (or omissions)...are limited to those which in and of themselves are sufficient to form the basis of a cause of action.'" Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1514 (D.C. Cir. 1988) (quoting H.R. REP. NO. 94-1487, at 19 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6618) (emphasis added). In Zedan, plaintiff sued the Saudi Government for its alleged failure to guarantee plaintiff's salary under his separate contract with a Saudi corporation for road construction in Saudi Arabia. Id. at 1512. Plaintiff, an American citizen, was recruited in the United States by an agent of the Saudi Government to work as an engineer for the private Saudi corporation on the road project. Id. Once in Saudi Arabia, plaintiff and the Saudi corporation signed a five-year employment contract. Id. The corporation later failed to pay plaintiff the money due him under the contract. Id. The Court of Appeals held that the plaintiff's breach of contract suit arose out of the contract entered into in Saudi Arabia, and not out of the

16

Saudi Government's recruitment activities in the United States. Id. at 1514.  The recruitment activities were insufficient "in and of themselves" to form the basis for the plaintiff's claim.  Id.

The same is true in this case.  Plaintiffs allege that the Defendants failed to warn of the inadequate security provided for the Vinnell Compound in Saudi Arabia.  But this, in and of itself, is insufficient to form the basis of Plaintiffs' claims. Plaintiffs' cause of action, to the extent one exists, only arose following the bombing in Saudi Arabia.  The second clause of the commercial activity exception only applies if the acts or omissions occurring in the United States are themselves alone sufficient to sustain a cause of action.[8]  Id.  The acts or omissions in this case--recruitment of Plaintiffs--do not meet that standard.  No actions taken by Defendants in the United States would support Plaintiffs' claims for failure to warn about the inadequate security in Saudi Arabia.[9]

---

[8] In their Opposition, Plaintiffs argue that a footnote in Gilson v. Republic of Ireland, 682 F.2d 1022, 1027 n.22 (D.C. Cir. 1982), supports their argument on this point.  The Court of Appeals, however, has held that Gilson is inconsistent with the Supreme Court's later decision in Saudi Arabia v. Nelson, 507 U.S. 349 (1993).  In re Papandreou, 139 F.3d 247, 253 n.4 (D.C. Cir. 1998).

[9] Plaintiffs are precluded from proceeding under the commercial activity exception for the additional reason that Defendants' actions do not constitute commercial activity under the FSIA.  Only when "a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial.'"  Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992).  The

17

The FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), is therefore not applicable, and the Court need not address Defendants' other arguments. Accordingly, because this case does not fall within any of the exceptions set out in the FSIA, the Defendants are immune from suit. 28 U.S.C. §§ 1330(a), 1604-05.

**IV. CONCLUSION**

For the reasons set forth above, Defendant's Motion to Dismiss [**Dkt. No. 9**] is **granted** and this case is dismissed for lack of subject matter jurisdiction.

July 10, 2008

/s/
Gladys Kessler
United States District Judge

**Copies to: Attorneys of record via ECF**

---

Defendants' participation in the FMS program, which is limited to foreign governments and international organizations, is the type of activity in which a private player cannot participate. "When two governments deal directly with each other as governments, even when the subject matter may relate to the commercial activities of its citizens or governmental entities...those dealings are not akin to that of participants in the marketplace." Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 168 (D.C. Cir. 1994) (emphasis in original). Furthermore, provision of security at a military facility, like the Vinnell Compound, is a quintessentially sovereign activity. Mwani v. bin Laden, 417 F.3d 1, 17 (D.C. Cir. 2005) (provision of security guards by Taliban for terrorist training camp in Afghanistan did not constitute commercial activity).